v. Thomas Ferrell, M.D., Individual and Official Capacities, 21-14027. Mr. Redman, you have reserved three minutes for rebuttal, and go ahead and get set up. Whenever you are ready, you may proceed. Thank you, Your Honor. May it please the Court. Caleb Redman on behalf of Mr. Collins. This deliberate indifference case is about the confiscation of Mr. Collins' prescribed walking cane and other medical deprivations. The case is before you now because it was decided prematurely at the summary judgment stage. At summary judgment, as this Court well knows, a district court must review the record in the light most favorable to the non-movement and deny summary judgment any time there's a genuine dispute of material fact. The district court here, though, flipped that standard. It improperly credited Dr. Ferrell's made-for-litigation declaration, and on that basis found that the doctor's deprivations were a mere exercise of medical judgment. A reasonable jury could disagree. It could find that the doctor knew the risk of harm to Mr. Collins and disregarded it, especially when the doctor confiscated Mr. Collins' cane. Start with knowledge. Under established precedent, including the Supreme Court's Farmer decision, knowledge can be inferred by its obviousness. And here, the doctor would have known Mr. Collins still needed a cane. The doctor would have known that because the doctor is the one who prescribed the cane, had heard Mr. Collins repeatedly complain about his continued soreness after his major knee surgery, and would have, in fact, seen Mr. Collins hobble into his appointment, according to the doctor's own notes, quote, using a cane. So I know that you have focused on this August 7th meeting with the doctor, where the doctor, taking it in the light most favorable to your client, seemed angry, snatched the cane away, and seemed dismissive. But I think that might be a myopic perspective. We need to look at the entirety of the medical interactions between your client and the doctor. And it looks like there were a whole host of medical interventions, including Dr. Ferrell and other doctors as well, including physical therapists and a surgeon. It looks like he was treated 17 times over six months. And so I guess, even if there was a moment of frustration, and we have evidence that was presented at summary judgment that seems to have persuaded the district court that this is just a difference of medical opinion, that, yes, he's taking the cane away, yes, he has hesitancy to prescribe Tylenol 3. But there are medical reasons for that. How is this not just a difference of medical opinion? So, Your Honor, I think there are two parts to the question. The first part was the number of times that my client had been seen. And this Court has established, at least since its 1980 decision back when it was part of the Fifth Circuit, its decision in Morrell, that being seen repeatedly is just not enough to keep the question from a jury. So there, the defendants had said that they had gone and seen the inmate 44 different times. And the Court said, well, that's fine, but that's a jury question. I mean, that might be relevant evidence, but that's a jury question. But that's not our case here. It's not just a case of seeing the doctor. The doctor is trying to work toward getting him more mobile. He's getting him surgery when he needs surgery. He recognizes there's an addiction problem, so a prescription of Tylenol 3 needs to be controlled. It is an opioid, after all. So again, this is not a case where, you know, they were saying, oh, there's nothing wrong with you. I've seen you 44 times. They're actually providing medical care. Sure. There was, the doctor was always doing something. That's not in dispute. But the medical care was completely denied, at least with respect to the purpose for the cane. I mean, the cane serves at least two purposes. One is pain. And you're right, the doctor has some evidence that it was continually treating pain. But the other is prevention. And at the time the doctor took away the cane and then the wheelchair, there was absolutely nothing to help mobility. And so there was nothing to prevent Mr. Collins from putting his 247 pounds on his still sore and still not fully healed knee after this major surgery where a prominent fragment of his kneecap had been removed. And so there, the doctor has some things to point to and say, well, look, I've done some things to help with the pain. But really, there's nothing to help prevent this almost inevitable re-injury, which happened just 10 days after the doctor took the cane. There's some disagreement in the briefs about that. I wonder if you can help me sort that out. I think your side convincingly says he has this injury very shortly after losing the cane. The doctor says, no, that wasn't real. I looked at the knee and it was fine still. Is there anything that helps sort that out for us? Or is that a difference of opinion that you think really should go to the jury? I think it should go to the jury. I will point to there's contemporaneous evidence or close to contemporaneous evidence that this really was an issue. So, for example, Mr. Collins, the day that his cane was confiscated, he, of course, complained of that. But then as part of that same complaint in October, he said that since his cane had been confiscated, he was no longer able to ascend or descend without falling or great pain. And he says there that he was able to do those sorts of things before the cane was confiscated. So I think we could reasonably, a jury could certainly reasonably look at that and say, well, what happened then was that pivotal moment. Really, it's the only thing in the record we can point to. That pivotal moment in August 17th, 10 days later, where my client says he felt this sudden rush of pain to his knee and looked down and saw that there was blood pooling just underneath the scar. And so I think a jury could look at all of those things and say, well, but that's that was the date of the incident. There's no other incident in the record. So that that was the date of the incident. And that, of course, ultimately led to a second surgery. So this was very serious for my client. And he obviously needed his cane. And yet the doctor disregarded that. Of course, after expressing Judge Branch, as you recognized earlier or alluded to, expressing frustration or what looks like frustration with my client. And in that way, this case is a lot like this court's Farrow decision there. The doctor, too, had expressed frustration and said he was sick of being bothered with the inmate. And then right after that, there was this prolonged period of deprivation of needing medical treatment. There was dentures. Wasn't it clear, though, in that case that the the medical treatment was needed? Whereas here you could see that maybe it was better for your client not to be relying on this cane so that his knee could be strengthened so that he could eventually return to complete mobility. Isn't doesn't that make an important difference where perhaps the best medical judgment was to tell him to to try to do without it? That's a jury question, because just as it was a jury question, by the way, in Dr. Farrell's other case, Johnson versus Lewis, because the doctor there had likewise put forward a medical explanation, which if believed would would mean that the doctor hadn't violated the Constitution. Was there any discussion prior to this August 17th visit that he the doctor thought he should stop using the cane as much or was going to be taking the cane away? No. And in fact, Mr. Collins was expressly asked that during his deposition. And he said, no, there had been no discussion of that. I haven't seen any evidence in the medical notes that the doctor had any reason to take away the cane. Everything suggests that Mr. Collins was, quote, ambulatory with the cane. That was in the medical records that he was using a cane, that he was an inmate who needed a cane, who used the cane. And in fact, just a week before the confiscation, his surgeon had told him to continue ambulating as tolerated with a cane. So everybody seems to acknowledge that Mr. Collins did need a cane. He was obviously relying on it. And yet the doctor confiscated it anyway. And the doctor did so. So suddenly reversed course without examining Mr. Collins knee on August 7th. And that matters because under this Court's Steele decision, a sudden reversal in medical treatment can give rise to an inference of deliberate indifference because it can suggest that the conduct was was it was gross misconduct. And a real cursory examination is just not enough. And he'd been seeing he'd been seeing Mr. Collins regularly. Right. So couldn't you assume from that record that he was familiar with the progress of the knee and simply decided that there was malingering going on or not the proper effort and this was the best way to move forward? I mean, it could reach that determination, Your Honor, but it could also reach the opposite determination because it's also reasonable to say that the doctor all along had seen that the cane was needed and reversed course without examining the knee. According to Mr. Collins testimony, there was no looking at my knee, no nothing. So every appointment up to then, the doctor had evidently viewed the cane as medically appropriate. So why reverse course now? Well, it's not because the doctor had examined Mr. Collins knee. It's not because the doctor had talked to Mr. Collins about his knee. It is because, according to the doctor's own testimony or excuse me, Mr. Collins testimony about what the doctor said, it's because the doctor was tired of all this pain nonsense. What about the fact Dr. Farrell is going to say, of course, that, yes, he took the cane away, but he did not rescind the prescription. The prescription for the cane was still in existence. And so then that was why he was able to reverse reverse course without writing a new prescription. Doesn't the existence of that prescription suggest that that Dr. Farrell was trying to work toward improving his mobility, but maybe realized there had been a setback? Your Honor, that line of argument from my friends on the other side actually confuses me, because if it's true that Mr. Collins did not need a walking cane, then it doesn't make any sense why the doctor here would just suddenly reverse course. The doctor actually never explains this reversal in course. So a jury could look at this and say the doctor was upset, took the cane, then saw that there was this injury in the doctor's notes, of course, make light of it and suggest it's nothing. But the doctor then knew that he had made a mistake and and just quietly had the cane returned. There is no there's no explanation in the test, in the doctor's declaration or the record more generally about why the doctor reissued the cane at all. One concern I have is under under your argument that the jury should decide this, doesn't that mean that every case like this where there's a difference of medical opinion between the claimant and the doctor goes to a jury? And I don't think that that's what our cases really say. I agree with you, Your Honor, that's not what the cases say, and I don't think that's that's what's going on here. What I think we've got going on here is not just a disagreement between the doctor and explaining why the cane was confiscated. And those words were that he's tired of hearing about all this pain nonsense. And so that makes this case a lot like the Farrow case. And of course, because the doctor didn't look at Mr. Collins knee at all, that also makes the sudden reversal in treatment. But are you are you suggesting that deliberate indifference exists because maybe a physician is frustrated for one day, but is nonetheless continuing to treat and do what's medically necessary for the patient? No, our point is simply that if the doctor is frustrated and because of that frustration totally deprives you of a critical medical tool that you've been relying on and needing such that that leads to a significant injury and months of pain, that that would give rise to deliberate indifference claim just as it did in Farrow. So that would be our position. I would like to go back. I had started talking about Dr. Farrell's other case, but Dr. Farrell there had also put forward a medical explanation. And this court rightly and recently decided that a jury could discredit that based on the facts that were there. And the same is true here. The jury could discredit the explanation given based on the testimony that the cane was deprived, was taken away out of frustration. Thank you. You still have three minutes for rebuttal, Mr. Draper. Thank you. This is a straightforward case that plainly calls for summary judgment. For years, Dr. Farrell gave Mr. Collins's knee consistent and proper treatment. He evaluated the knee multiple times. He gave him a walking cane. He gave him multiple rounds of pain medication. He referred him to an orthopedic specialist. He referred him for physical therapy. He referred him for pain management clinic, and he gave him instructions on how to take care of the knee on his own. But despite doing all of that, Mr. Collins says that Dr. Farrell was somehow deliberately indifferent. Simply put, the evidence can't support that conclusion. And in fact, the two pieces of evidence on which Mr. Collins chiefly rests his case, first, the fact that Dr. Winchell supposedly or Dr. Winchell's recommendation, and then second, the statement that Dr. Farrell supposedly made when he removed the cane. Both of those pieces of evidence actually support Dr. Farrell's version of events, not Mr. Collins. So first, as for Dr. Winchell's recommendation, Mr. Collins seems to suggest that when Dr. Farrell removed the cane, that was somehow in tension or in conflict with Dr. Winchell's recommendations. But in fact, the opposite is true. So after Mr. Collins' surgery, Dr. Winchell specifically recommended that Collins walk a bare weight on his knee as tolerated and use a walking aid like a cane only as needed. That's exactly what Dr. Farrell did when he temporarily removed the cane. He wanted to see if Mr. Collins could bear weight on his knee. And then after seeing whether he could do that, he reissued the cane just a few weeks later. And then second, as for the statement that Dr. Farrell supposedly made when he withdrew the cane. What about, but I mean, the point is he reissued it two weeks later. So what, isn't it a different view of the evidence that he knew he couldn't use the cane? He couldn't, he couldn't operate without the cane. He got mad about it, took it away. And then two weeks later, he came to his senses and started to treat him properly again. So I think there's two things. One is whether he knew that Dr., or that Mr. Collins couldn't walk without the cane. I don't think that's true because Mr. Collins had, well, one, Mr. Collins before the surgery had spent many, many years walking without a cane. And then Dr. Farrell had issued the cane to him just a few months before the surgery. After the surgery, he had been walking on the cane for just a few months. And it was never meant to be a permanent solution that Mr. Collins was going to walk on the cane. One, Dr. Farrell had only issued the cane profile for a year. So it was always meant to be temporary in some sense. And then again, Dr. Wintel's recommendations seem to suggest that he should work towards walking on the knee unaided and start to bear as much weight as he could tolerate. Eventually, that's going to require asking Mr. Collins to not walk with the cane and try bearing weight on his knee. Second, and that sort of brings me to the statement that Dr. Farrell made. Um, so Mr. Collins says that when Dr. Farrell removed the cane, he supposedly said that he was fed up with all of this pain nonsense and that that somehow suggests that Dr. Farrell was removing the cane out of frustration instead of as a medical judgment. But again, I think the opposite is true. Assuming that Dr. Farrell really did say that at most, the statement just suggests that Dr. Farrell wanted Mr. Collins to be walking without the cane. And he didn't think that the pain was a good enough reason not to be doing that because obviously Mr. Collins is going to be feeling pain. He had just gone through a major surgery, was recuperating. And that's what the rest of the treatment was for. So the same day that he removed the cane, Dr. Farrell also prescribed physical therapy. And this was going on at the same time that Dr. Farrell had been administering a number of, a battery of different pain medications. So I don't think there's any evidence that he was trying to cause pain. In fact, the contemporaneous evidence, the other treatment suggests the opposite. But what about, what about his mobility? I mean, you're just taking away a cane and not for maybe a few hours, but for weeks until he, then you see he can't use it. His mobility is an issue in this prison where apparently it's hilly, there are stairs. How is that reasonable? There are a number of courts, one, that have recognized that it's very reasonable to ask a patient who's trying to improve their mobility to walk unaided for some time. The Tenth Circuit, we cite that decision in our briefing. The Callahan decision has said that. I think this court has said that in an unpublished decision as well. And in fact, there are a number of recognized concerns that if a patient who's trying to improve their mobility continues to use walking aids too much, it can actually inhibit mobility rather than improve it, because it can lead to muscle atrophy and prohibit a full range of movement in the leg. Are there any, any notes in the record that he talked to Mr. Collins about this in previous visits about needing to use the cane less and I'm going to eventually take it away from you? Anything? I don't know if there's anything in the record where Mr. Collins specifically had a conversation or where Dr. Farrell specifically had a conversation with Mr. Collins about that. I think it's obvious from Dr. Winchell's recommendations that he wanted, wanted Mr. Collins to be walked to bear as much weight on the knee as tolerated. So I think it's pretty implicit in that set of instructions there. And I don't think Mr. Collins was ever under the impression that he ought to be using the cane on a permanent basis indefinitely. So if we think that, if we think that taking away the cane was an objectively reasonable thing to do, do we need to consider Dr. Farrell's mindset? No. To be clear, I don't, I don't think he had any sort of culpable mindset. But you're correct, Your Honor, that in order to show deliberate indifference, the plaintiff has to show a number of things. One, he has to show that there was an objectively serious medical need. Two, he has to show that the defendant disregarded that in a, in a, to a level meeting, reckless disregard. That would be sort of the subjective mindset that he had. Was he aware? Did he intend to cause pain in the worst instance? But then the last thing is, if the treatment given was ultimately reasonable, that's an independent barrier to deliberate indifference liability. And I think in both of the claims being put forward here, both on taking away the cane, for the reasons I've explained, in order to help him reach full mobility unaided, that's an eminently reasonable decision. But then also declining to prescribe opioid medications. I think a number of courts have said this is, that's also a very reasonable decision. Do you agree that the objective substantial risk of harm prong of deliberate indifference is met here? So I think we agree that having a knee issue like Mr. Collins had here was an objective risk of harm, objectively serious risk of harm. I want to be clear, I don't, there's no evidence in the record that Mr., that Dr. Farrell knew that having Mr. Collins walk without a cane was likely to lead to re-injury. So I'm not sure. We don't think that the subjective knowledge prong here was met. But, but, but yes, his knee condition wasn't objectively serious. Not an issue. We've talked a lot about the cane. I suspect that's because that's a little bit trickier. But I do have a question about the opioids. Is there any situation where failure to prescribe these high-powered opioids could be, could constitute deliberate indifference? I'm not aware of any particular scenario. So it's clear that it could be deliberate indifference if a doctor, in some cases, refuses to prescribe any pain medications at all. But otherwise, questions about what particular medicine to administer, particularly if it's just a difference between stronger or weaker medication, that's a quintessential question of medical judgment and something that normally can't establish 1983 liability. What does a terminal cancer patient say? So the risk of abuse is not present, but the, you know, the doctor is a sadist and wants to see the person suffer. Could it qualify in that case? The fact specific does not. I do think in that case, if the risk of abuse is less present, that would obviously, I think, affect the calculus a little bit. You know, maybe the pain medication that strong just isn't needed at all, and weaker pain medication would count. But in this case, obviously, there was a concern about addiction. Dr. Farrell, you know, specifically in his declaration notes that he was concerned that when Mr. Collins was exhibiting narcotic-seeking behavior based on how many times he had been requesting Tylenol-3, and then, of course, he was just concerned generally about the potentially addictive nature of the medication. What about the argument that the replacement painkiller also has a risk of abuse? I'm sorry? What about the argument that a replacement painkiller that was used also has a risk of abuse? But again, I think that just puts us back in the realm of quintessential medical judgment. Of course, any kind of medication can have side effects. Any kind of pain medication can present a risk of abuse. But it's clear that some medications present those risks to a much greater degree than others. And that's why we have doctors and experts who can make that medical judgment based on the specific facts surrounding their patient. So if we're in the realm where we're just fighting about, oh, well, this medication was marginally more or less likely to lead to addiction, this medication was marginally stronger or weaker, more or less likely to reduce the pain, I think that makes it very clear that we're in the realm of medical judgment there, and this is not a case of potential denial of treatment altogether. And there's no suggestion that the substitute medication risk for the potential for abuse was the same level as an opioid? Correct. Yeah. But at what point do you get concerned about the fact that these medications did not seem to be working for him in terms of his pain management? I mean, is there something in the record to show that Dr. Farrell could have considered something else besides Neurontin and Cymbalta, which are, I think, more for nerve pain? Anything there? Do we just keep sticking with the ones that he's saying are not working for him? So one important thing to consider, Your Honor, is that the only real evidence that the pain medication wasn't working was the fact that Mr. Collins himself was repeatedly requesting the stronger pain medication. I don't think that Dr. Farrell had any reason beyond that to know or to think that the pain medication wasn't working. But again, I think two things. One, again, that's just a matter of medical judgment, whether it's worth the risk, whether the pain reaches the level of intolerance that it's worth the risk of putting the patient onto a more dangerous set of pain medications. I think that's very much in the realm of medical judgment. The second thing to remember is that the pain medications weren't the only treatment that were being given for the pain issue. First, Dr. Farrell had prescribed physical therapy that Mr. Collins was going through. And in fact, Mr. Collins later refused to continue with the physical therapy precisely because he wasn't getting the Tylenol-3 that he wanted. So Dr. Farrell was trying to give Mr. Collins a variety of different forms of pain treatment. Wasn't his argument that the physical therapy was too painful without the Tylenol-3? Yeah, it's his argument. But again, I think the pain is sort of inherent in having had a major surgery and going through the recuperation process. And I think to tie it back to the cane issue, right, the patient needs to go through the pain, needs to go through to like keep pushing the boundaries, reach different levels of tolerance to return to full mobility. So I think the fact that there's some kind of pain isn't enough reason to get to the level of deliberate indifference where the doctors, you know, sort of multifaceted treatment method, giving physical therapy, giving him different kinds of pain medications, even if they're not exactly what the patient wanted. Then he also prescribed this TENS unit, which was a kind of nerve treatment. And of course, at the same time, Mr. Collins got multiple sort of injections that helped deal with the pain. So, you know, it borders, I think, on the level of absurdity to say that it's deliberate indifference where the doctor didn't prescribe the exact kind of pain medication that the patient wanted, but he did, you know, three, four, five different other kinds of pain treatment. In your brief, you say that the court should reach the issue of qualified immunity, but the district court did not. Can you speak a little bit more on that? Yes, I think the district court didn't reach that issue simply because it's clear that Dr. Farrell wins on the merits here, so qualified immunity wasn't necessary. We think that's true as well because Dr. Farrell's actions were actually reasonable, and we don't think that any of the evidence Mr. Collins has put forward suggests that Dr. Farrell recklessly disregarded any of his medical issues. But of course, if this court were inclined to disagree with us on that, qualified immunity would be an equally strong basis on which to decide for Dr. Farrell. I don't think Mr. Collins has identified really any case from this jurisdiction that's on all fours with this one, and so qualified immunity plainly applies. And if there are no further questions, I'd be happy to sit down. Thank you, Your Honors. Thank you very much, Mr. Draper. Mr. Rudman, you have three minutes. Thank you, Your Honor. Four quick points. The first one is, my friends on the other side have mentioned that the doctor did use other kinds of treatment, but this court in McGilligott made clear that, quote, it simply misstates controlling law when he argues his provision of medical care precludes an Eighth Amendment claim. And that has also been true in this case law since at least the 1980s. Rogers v. Evans is another case we rely on, where this court made clear that one episode of gross misconduct is enough or can be enough to go to a jury, notwithstanding a general pattern of attentiveness. So that's well established under this case law, and I think it refutes their argument. The second is that they see the surgeon's instructions as somehow supporting them. I just think a reasonable jury could very easily reach the opposite conclusion, including because the surgeon had said just a week before that Mr. Collins should continue to walk with a cane. That was in Mr. Collins' deposition and hasn't been refuted. Those instructions are clear. You need a cane. Number three, on the pain medication, just quickly, we've got the doctor looking at essentially two different options. There's the Neurontin and there's the Tylenol-3. Both are subject to abuse. The doctor had prescribed Tylenol-3 before for about a month and a half, but that was prior to his exasperation with Mr. Collins, where he took the cane and said, I'm tired of all this pain nonsense. So he had prescribed Tylenol-3 before. And so the question the jury would have to face is, why aren't you prescribing it now? Everybody knows it works. The surgeon had repeatedly requested it. Mr. Collins had repeatedly requested it. So why aren't you prescribing it now? Everybody also knows, though, that opioids have a really high risk of addiction and patients will tend to ask for them once they've become addicted. That is completely plausible. And if a jury were to credit that explanation, that would be fine. We would lose with respect to that. But I think a jury could discredit that explanation in part because the doctor had given Tylenol-3 before and was not now. And a jury could say, well, the turning point is not that suddenly you've become concerned about abuse. After all, you did give other medication that was useless. But the turning point is that your explanation of you're tired of all this pain nonsense. So that's a reasonable inference for a jury to draw. And that should be enough for the jury to reach the jury. And the fourth is unqualified immunity. My friends on the other side say there's no case directly on point. But Judge Branch, your opinion in Wade lays out the established case law, which is there are a number of ways to satisfy qualified immunity. The overarching question with qualified immunity is, does the official know? Is the official on fair notice of what the law requires? And here, the principles that we've relied on have been established since at least 1985 in this court's Nkata case and have been consistently applied even to Dr. Farrell just recently. And so for all of those reasons, we think the district court got it wrong, should have denied the motion for summary judgment. And since it didn't, this court should reverse and allow Mr. Collins to have his day in court. Thank you. Thank you, Mr. Draper. Thank you, Mr. Redman. Thank you both. And we have your case under advisement. Our third and final.